ORDERED.

**Dated:  April 06, 2026**

Luis E. Rivera II
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:

IHN PODIATRY SERVICES,
PLLC,

      Debtor.

_____/

Case No. 8:26-bk-00384-LER
Chapter 11

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
EMERGENCY MOTION TO ENFORCE THE AUTOMATIC STAY**

Before the Court is the *Emergency Motion to Enforce the Automatic Stay*

(the "**Motion**")[1] filed by IHN Podiatry Services, PLLC (the "**Debtor**"). The

Motion asks the Court to direct the Department of Health and Human

Services, the Centers for Medicare and Medicaid Services, First Coast Service

Options, Inc., and other Medicare administrative contractors collectively,

"**CMS**"),[2] the Department of Treasury's Bureau of Fiscal Service (the

---

[1] Doc. No. 10.

[2] The Centers for Medicare & Medicaid Services is an agency in the United States
Department of Health and Human Services that provides health coverage to more than 160

"**Treasury**"), and CBE Group, Inc. ("**CBE Group**") to "cease offsetting their disputed overpayment claims against the Debtor's post-petition revenues arising from services rendered after the petition date to Medicare beneficiaries, as well as any other amounts owed to the Debtor by the federal government."[3]

The Court held an emergency hearing on the Motion on January 21, 2026, and entered an interim order directing First Coast and CBE Group to immediately stop all efforts to collect pre-petition obligations owed by the Debtor to First Coast or CBE Group. The Court also directed First Coast and CBE Group to immediately stop all efforts to obtain possession of or exercise control over property of the estate, including the Debtor's tax refunds.[4]

The Court scheduled another hearing for February 4, 2026, and directed the Debtor and any parties in interest to file memoranda addressing the Court's jurisdiction to grant the relief requested given the Eleventh Circuit's

---

million through Medicare, Medicaid, the Children's Health Insurance Program, and the Health Insurance Marketplace. *About Us*, CMS.gov, https://www.cms.gov/about-cms (last visited Apr. 6, 2026). First Coast Service Options, Inc. is a Medicare administrative contractor who performs some day-to-day administrative duties on behalf of CMS as provided in 42 U.S.C. § 1395kk-1. Doc. No. 40, at 2. A "medicare administrative contractor" is an organization with a contract to perform administrative duties on behalf of CMS. 42 U.S.C. § 1395kk-1(a)(3)(A). The Motion seeks relief against the Department of Health and Human Services, the Centers for Medicare & Medicaid Services, First Coast Service Options, Inc., and "any other Medicare Administrative Contractor who may become obligated to reimburse the Debtor during the pendency of the case." Doc. No. 10, at 1. But CMS is "the real party of interest in any litigation involving the administration of the Medicare program." 42 C.F.R. § 421.5(b).

[3] Doc. No. 10, at 1.

[4] *Interim Order Granting, In Part, Debtor's Emergency Motion to Enforce the Automatic Stay and Continuing Hearing on Motion* (Doc. No. 31).

decision in *In re Bayou Shores SNF, LLC*.[5] At the conclusion of the hearing on February 4, 2026, the Court authorized the Debtor and CMS to file declarations, following which the Court would consider the matter.[6]

For the following reasons, the Court concludes the automatic stay does not apply to CMS's past or future exercise of its right of recoupment. Still, the automatic stay enjoins CMS, the Treasury, and CBE Group from any act to collect the alleged Medicare overpayments from property of the estate, including any non-Medicare debt owed to the Debtor. These are the Court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 4001 and 9014.

## I. Jurisdiction

Despite 42 U.S.C. § 405(h), the Court has jurisdiction to hear this contested matter under 28 U.S.C. §§ 1334 and 157. Section 405(h) of Title 42, made applicable to Medicare claims by 42 U.S.C. § 1395ii, "bars § 1334

---

[5] *In re Bayou Shores SNF, LLC*, 828 F.3d 1297 (11th Cir. 2016). In response to the Court's request, on January 30, 2026, the Debtor filed its *Supplemental Memorandum of Law in Support of Emergency Motion to Enforce the Automatic Stay* (Doc. No. 37). And on February 2, 2026, CMS filed its *Opposition Response to Debtor's Emergency Motion to Enforce the Automatic Stay* (Doc. No. 40).

[6] The Debtor filed the *Declaration of John Ebsworth in Support of Debtor's Emergency Motion to Enforce the Automatic Stay* (Doc. No. 52) on February 13, 2026, and *Debtor's Second Supplemental Memorandum of Law in Support of Emergency Motion to Enforce the Automatic Stay* (Doc. No. 63) on February 25, 2026. CMS filed the *United States' Supplemental Response in Opposition to the Debtor's Emergency Motion to Enforce the Automatic Stay* (Doc. No. 66) on February 25, 2026.

jurisdiction over claims that 'arise under [the Medicare Act]."[7] However, the dispute before this Court does not arise under the Medicare Act.[8] Instead, the Debtor's claim that collection of Medicare overpayments from the Debtor violates the automatic stay arises under the Bankruptcy Code.[9] And a determination of the extent of the automatic stay is a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (G).

## II. Background

These facts are undisputed. The Debtor runs a mobile medical clinic that provides wound care and podiatry services.[10] It is enrolled as a participating supplier in the Medicare program[11] and supplies most of its services to Medicare beneficiaries under Medicare Part B.[12]

Medicare is the federal health insurance program for the elderly and the disabled.[13] Medicare is "a massive, complex program embodied in hundreds of

---

[7] *In re Bayou Shores SNF, LLC*, 828 F.3d at 1314.
[8] The Respondents do not dispute this conclusion.
[9] *See Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1073 (3d Cir. 1992) (holding the issue of whether the Secretary's attempts to recover pre-petition overpayments through post-petition withholding violates the automatic stay arises under the Bankruptcy Code and not under the Medicare statute); *Fischbach v. Ctrs. For Medicare & Medicaid Servs. (In re Fischbach)*, No. 1:12-cv-00513-JMC, 2013 WL 1194850, at *2 (D.S.C. Mar. 22, 2013) (concluding determinations as to whether recoupment is available to a Medicare contractor arise under the Bankruptcy Code, rather than the Medicare Act).
[10] Doc. No. 10, at 1; Doc. No. 52, at 1.
[11] Doc. No. 10 at 5 (noting "The Debtor is an enrolled Medicare Part B provider"); Doc. No. 52, at 3.
[12] Doc. No. 40, at 3 ("The Debtor provides services under Part B of the Medicare program"); Doc. No. 52, at 2 ("Approximately 92% of the Debtor's revenues are generated from services rendered to Medicare beneficiaries").
[13] Doc. No. 40, at 2.

pages of statutes and thousands of pages of often interrelated regulations."[14]

CMS administers the Medicare program.[15]

Before the petition date,[16] CMS rendered three Medicare Part B claim overpayment determinations as to the Debtor, asserting the Debtor was overpaid almost $3.7 million for services rendered to six beneficiaries between December 2022 and July 2024.[17] The Debtor took administrative appeals of these decisions.[18] And the appeals remain unresolved as of the petition.[19]

In April 2025, while the administrative appeals were pending, CMS began to recover the alleged Medicare overpayments using the mechanisms provided by the Medicare regulations.[20] Among other things, CMS adjusted payments on the Debtor's Medicare reimbursement claims for wound care and podiatry services provided to other Medicare beneficiaries.[21] Additionally, the Treasury and CBE Group may have intercepted a federal tax refund owed to the Debtor of $28,346.00.[22] The Debtor estimates CMS owes the Debtor about $2,000,000.00 on account of the intercepted federal tax refund and Medicare

---

[14] *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000) (cleaned up).

[15] *Supra* note 2; Doc. No. 10, at 4; Doc. No. 40, at 2.

[16] Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code on January 19, 2026. The Debtor, which is a small business debtor, elected to proceed under Subchapter V of Chapter 11.

[17] Doc. No. 10, at 6-12.

[18] *Id.* at 6.

[19] *Id.*

[20] *Id.* at 12.

[21] *Id.*

[22] *Id.* at 12-13.

reimbursement claims for services provided to other Medicare beneficiaries.[23] And this is where the parties' positions diverge.

The Debtor contends any Medicare reimbursement claims for post-petition services provided to other Medicare beneficiaries are property of the estate and any post-petition adjustment of payment for post-petition services unrelated to CMS's disputed overpayment claims violates the automatic stay.[24] CMS contends its adjustment of the Debtor's Medicare payments on account of, and in the amount of, the previous Medicare overpayments is recoupment, which does not implicate the automatic stay.[25]

### III. Analysis

The filing of a bankruptcy petition triggers the automatic stay under Section 362(a) of the Bankruptcy Code,[26] which suspends a broad range of collection activity against a debtor and property of the estate.[27] In Congress' own words,

> The automatic stay is one of the fundamental debtor protections provided by bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or

---

[23] *Id.* at 13.

[24] Doc. No. 10, at 2.

[25] Doc. No. 40, at 13.

[26] 11 U.S.C. § 101 - 1532 (the "**Bankruptcy Code**" or the "**Code**"). Unless otherwise indicated, all statutory references are to the Bankruptcy Code.

[27] *See Carver v. Carver*, 954 F.2d 1573, 1576 (11th Cir. 1992) ("The automatic stay provisions of the Bankruptcy Code are quite broad").

6

reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.[28]

Here, the Debtor asserts CMS and the Treasury's post-petition recovery of the alleged Medicare overpayments violates the automatic stay because "(A) the postpetition Medicare reimbursements to which the Debtor is or will be entitled are property of the estate, (B) the police power exception under § 362(b)(4) is inapplicable, and (C) CMS's conduct constitutes set off, not recoupment."[29] CMS responds that "[t]he withholding of a supplier's Medicare payments on account of, and in the amount of, a previous Medicare overpayment received by the supplier is well-recognized as recoupment" and "the filing of a bankruptcy case does not affect the right of recoupment."[30] Thus, the key issue is whether CMS' efforts to recover the alleged Medicare overpayments it made to the Debtor by adjusting payment on the Debtor's post-petition Medicare claims are setoff, which is barred by the automatic stay,[31] or whether CMS' actions are in the nature of recoupment, which does not implicate the automatic stay.[32]

---

[28] *B.F. Goodrich Emps. Fed. Credit Union v. Patterson (In re Patterson)*, 967 F.2d 505, 512 n.9 (11th Cir. 1992) (quoting S. REP. 95-989, 54–55, 1978 U.S.C.C.A.N. 5787, 5840-41).

[29] Doc. No. 10, at 14.

[30] Doc. No. 40, at 13. CMS concedes that the Treasury's collection efforts to offset the Debtor's tax refund do not qualify as recoupment. Doc. No. 40, at 1 n.1.

[31] *See* 11 U.S.C. § 362(a)(7) (staying "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor").

[32] 3 COLLIER ON BANKRUPTCY ¶ 362.03 [9][b] (16th ed. 2026) ("Although setoff is clearly stayed by section 362(a)(7), courts have held that recoupment is not stayed automatically").

## 1. Setoff and Recoupment

Setoff and recoupment are remedies seeking to resolve mutual indebtedness. "Setoff involves mutual debts arising from unrelated transactions and recoupment covers reciprocal obligations arising out of the same transaction."[33]

Setoff rights are generally preserved in bankruptcy but are subject to the Bankruptcy Code's requirements. Section 553, with some exceptions, allows a creditor to setoff mutual debts where both the creditor's obligation to the debtor and the debtor's obligation to the creditor arose before bankruptcy.[34] But a creditor must obtain relief from the automatic stay before exercising a right of setoff.[35] Application of the stay allows the court to determine the rights of the parties before a debtor or the estate is deprived of its interest in the funds.[36] Recoupment is the right to reduce the amount of a claim based on the

---

[33] *United Structures of Am., Inc. v. G.R.G. Eng'g, S.E.*, 9 F.3d 996, 998 (1st Cir. 1993) (quoting 1 David G. Epstein et al., Bankruptcy § 6–45, at 703 (1992)).

[34] *See* 11 U.S.C. § 553 (providing, generally, that "this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case"); *In re Dillard Ford, Inc.*, 940 F.2d 1507, 1512 (11th Cir. 1991) ("A pre-petition setoff is valid as long as it complies with the state law governing a creditor's right to setoff and with the requirements of section 553").

[35] *B.F. Goodrich Emps. Fed. Credit Union v. Patterson (In re Patterson)*, 967 F.2d 505, 509 (11th Cir. 1992) ("In order to exercise a valid right of setoff, a creditor must move the court for relief from the stay pursuant to the provisions in Section 362(d)").

[36] 3 COLLIER ON BANKRUPTCY ¶ 362.03 (16th ed. 2026).

claimant's debt arising out of the same transaction.[37] It is often applied when the claims arise out of a contract or agreement that provides for estimated payments subject to later adjustment.[38] Recoupment is a "defensive matter springing from the same transaction as the plaintiffs' cause of action, which is available only to reduce or satisfy plaintiffs' claim."[39]

While the Bankruptcy Code does not explicitly reference recoupment, courts have long recognized recoupment in bankruptcy.[40] Unlike setoff, recoupment is available post-petition even if the initial obligation and the later right to reduce that obligation arise before the bankruptcy case is filed.[41] Because recoupment is a defense to a debtor's claim rather than a creditor's claim for payment, it does not violate the automatic stay.[42] It calculates the

---

[37] *See generally Anes v. Dehart (In re Anes)*, 195 F.3d 177, 182 (3d Cir. 1999); *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079–80 (3d Cir. 1992); 5 COLLIER ON BANKRUPTCY ¶ 553.10 (16th 2026).

[38] *See, e.g., Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir. 1986); *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984).

[39] *In re Sundale, Ltd.*, 499 F. App'x 887, 892 (11th Cir. 2012) (quoting *Kellogg v. Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A.*, 807 So. 2d 669, 670 n.2 (Fla. 4th DCA 2001)) (cleaned up). *See also Beach v. Great W. Bank*, 692 So. 2d 146, 150 (Fla. 1997) (noting that recoupment may be asserted defensively where underlying claim is barred by statute of limitations).

[40] *See, e.g., Reiter v. Cooper*, 507 U.S. 258, 265 n.2, 113 S. Ct. 1213, 122 L. Ed. 2d 604 (1993); *In re B & L Oil Co.*, 782 F.2d at 157; *Lee*, 739 F.2d at 875 ("The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable"); 5 COLLIER ON BANKRUPTCY ¶ 553.10 (16th ed. 2026).

[41] *In re Anes*, 195 F.3d at 182 ("The right of recoupment is not subject to the § 553 requirement that both debts arise prior to the debtor's entry into bankruptcy").

[42] *United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390, 395 (D.C. Cir. 1997); 3 COLLIER ON BANKRUPTCY ¶ 362.03 [8][a] (16th ed. 2026).

9

correct obligation.[43] The automatic stay does not apply "because, properly construed, recoupment applies to define the obligation in question, rather than establish or enforce a separate debt."[44] Put another way, a debtor has no right to funds properly subject to recoupment, and the funds are not property of the debtor's estate protected by the automatic stay.[45]

The critical distinction between setoff and recoupment is whether the mutual debts arise out of the same transaction.[46] By example, setoff occurs when A reduces the amount to be paid B for the purchase of a car by the amount B owes A for the purchase of a bike. Because the mutual debts arise from different transactions, setoff would be stayed by Section 362(a)(7) but could be asserted in bankruptcy as authorized by Section 553.[47] Recoupment occurs when A reduces the amount to be paid B for the purchase of a car by the amount A spent to bring the car into working condition. Because the mutual debts arise from the same transaction, the pre-petition debt could be recouped in bankruptcy without violating the automatic stay because it would be

---

[43] *Reiter*, 507 U.S. at 265 n.2 ("Recoupment permits a determination of the 'just and proper liability on the main issue"); *In re B & L Oil Co.*, 782 F.2d at 157 (typical recoupment in bankruptcy allows calculation to "reduce the balance due").

[44] 5 COLLIER ON BANKRUPTCY ¶ 553.10 (16th ed. 2026).

[45] *Matter of Kosadnar*, 157 F.3d 1011, 1016 (5th Cir. 1998) (stay is not violated because debtor has no interest in funds subject to recoupment).

[46] *See In re TLC Hosps., Inc.*, 224 F.3d 1008, 1011 (9th Cir. 2000) (noting the distinction between setoff and recoupment is that "the claims or rights giving rise to recoupment must arise from the *same transaction or occurrence* that gave rise to the liability sought to be enforced by the bankruptcy estate").

[47] *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 3–4 (1st Cir. 2004) (*citing United Structures of America, Inc.*, 9 F.3d 996, 999–1001(1st Cir. 1993)).

inequitable for B "to enjoy the benefits of that transaction without also meeting its obligations."[48]

## 2. The Medicare System

CMS's actions, here, must be evaluated in the context of Medicare, the complex federal health insurance system for the elderly and the disabled. Medicare Part B is a voluntary program established under the Social Security Amendments of 1965[49] that provides supplementary medical insurance covering medical and health services.[50] Medicare Part B beneficiaries are financially responsible for health services covered by the program, and Part B payment can be made directly to them.[51] A health care practice, however, may enroll in the Medicare program as a participating Medicare Part B supplier.[52] (And the Debtor here did so.[53])

---

[48] *Id.* at 3 (*citing Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1081 (3d Cir. 1992). *See also Matter of U.S. Abatement Corp.*, 79 F.3d 393, 399–400 (5th Cir. 1996) (cost of subcontractor liens recouped from contract price as recoupment is designed to equitably determine liability on claim).

[49] Pub. L. No. 89-97, 79 Stat. 286 (1965), codified at 42 U.S.C. § 1395 - 1395mmm (the "**Medicare Act**").

[50] *See* 42 U.S.C. § 1395j (establishing "a voluntary insurance program to provide medical insurance benefits in accordance with the provisions of this part for aged and disabled individuals who elect to enroll under such program").

[51] *See generally* 42 U.S.C. § 1395u(b)(6) & 1395u(h).

[52] 42 U.S.C. §§ 1395u(h), 1395x(d), & 1395cc. *See United States v. Hagen*, 60 F.4th 932, 937 (5th Cir. 2023) (supplier must be enrolled in Medicare to submit eligible claim). *See also United States v. Anderson*, No. 24-10059, 2025 WL 26147, at *1 (11th Cir. Jan. 3, 2025) (*per curiam*) ("To serve Medicare patients, a health care provider must enroll as a Medicare provider").

[53] Doc. No. 52, ¶ 9.

Enrollment gives a participating supplier the right to bill Medicare directly[54] and receive prompt payment for services rendered to Medicare beneficiaries.[55] In doing so, the supplier agrees to accept Medicare payments as payment in full and not charge more amounts apart from applicable deductibles and copayments.[56] The amount to be paid under Part B for any service is based on fee schedules issued by the Secretary of Health and Human Services.[57]

When a Medicare claim is filed, the applicable contractor is required to "[d]etermine if the items and services furnished are covered or otherwise reimbursable under [Medicare]" and, if so, "[d]etermine any amounts payable and make payment accordingly."[58] But Part B payments remain subject to review, reopening, and recoupment of overpayments to ensure the integrity of the Medicare program.[59]

---

[54] 42 U.S.C. §§ 1395u(b)(3)(B)(ii), 1395u(b)(6), & 1395u(h).

[55] *See* 42 U.S.C. § 1395u(c) (requiring "clean claims" generally be paid within thirty days after receipt of the claim).

[56] *See generally* 42 U.S.C. §§ 1395u(b)(3)(B)(ii), 1395u(b)(6), & 1395u(h).

[57] *See* 42 U.S.C. § 1395hh(a) (requiring the Secretary to prescribe regulations to carry out the administration of the Medicare system); 42 C.F.R. § 405.501 (establishing that Medicare Part B pays on the basis of "reasonable charge" and "reasonable costs," as the case may be, for covered services); 42 C.F.R. §§ 414.1 – 414.700 (establishing various schedules for Medicare Part B payments).

[58] 42 C.F.R. § 405.920.

[59] *See, e.g.,* 42 U.S.C. § 1395ff(b)(1)(G) ("The Secretary may reopen or revise any initial determination or reconsidered determination described in this subsection under guidelines established by the Secretary in regulations"); 42 U.S.C. § 1395ddd (establishing Medicare Integrity Program charged with determining and recovering overpayments); 42 C.F.R. § 405.371 (authorizing CMS to suspend, offset, or recoup Medicare payments after overpayment decision is made); 42 C.F.R. § 405.980 (establishing procedures for reopening initial determinations, redeterminations, reconsiderations, decisions, and reviews).

An initial determination may be reopened by the contractor within four years for good cause or within one year for any reason.[60] "A reopening is a remedial action taken to change a binding determination or decision that resulted in either an overpayment or underpayment, even though the binding determination or decision may have been correct at the time it was made based on the evidence of record."[61] "The contractor's [ ] decision on whether to reopen is binding and not subject to appeal."[62]

After reopening of an initial determination, the contractor may conduct a post-payment review that can result in "either no change to the initial determination or a revised determination."[63] When the reopening results in a revised determination, the contractor must give the supplier notice of its revised determination.[64] Unless a written request for a redetermination is accepted and processed under Medicare regulations, a revised determination binds all parties.[65]

### 3. Medicare Overpayments

The recovery of Medicare overpayments is central to the integrity of the Medicare system. Overpayments are "funds that a person receives or retains

---

[60] 42 C.F.R. § 405.980(b)(1) & (2).
[61] 42 C.F.R. § 405.980(a)(1).
[62] 42 C.F.R. § 405.980(a)(5).
[63] 42 C.F.R. § 405.929(d).
[64] 42 C.F.R. § 405.982(a).
[65] 42 C.F.R. § 405.984(a).

under [Medicare] to which the person, after applicable reconciliation, is not entitled."[66] CMS must recover overpayments.[67] When determined that a Medicare supplier received an overpayment, the contractor starts the overpayment recovery process by sending a demand letter requiring repayment.[68] If a supplier disagrees with an overpayment decision, the supplier can request an appeal. [69]

Unless a supplier voluntarily repays an overpayment, the contractor may recover the overpayment by recouping the payment against present or future Medicare payments.[70] A contractor may begin recoupment on the forty-

---

[66] 42 U.S.C. §§ 1320a-7k(d)(4)(B).

[67] *See generally* 42 U.S.C. § 1320a-7k(d)(1). *See also* Ctrs. for Medicare & Medicaid Servs., *Medicare Overpayments*, MLN006379 (July 2025), https://www.cms.gov/files/document/medicare-overpayments.pdf ("Laws and regulations require [CMS] to recover overpayments").

[68] *Id.*

[69] Medicare Part A and Part B have five appeal levels:

> 1. Redetermination occurs after the initial Part A and Part B claims determination. A MAC reexamines the claim and supporting documentation. A MAC employee not involved in the initial determination makes the redetermination.
>
> 2. Reconsideration by a qualified independent contractor.
>
> 3. Hearing by an administrative law judge or review by an attorney adjudicator at the Office of Medicare Hearings and Appeals.
>
> 4. Review by the Medicare Appeals Council.
>
> 5. Judicial Review in U.S. District Court.

Ctrs. for Medicare & Medicaid Servs., *Medicare Overpayments*, MLN006379 (July 2025), https://www.cms.gov/files/document/medicare-overpayments.pdf.

[70] 42 C.F.R. § 405.371(a)(3). Medicare regulations define "recoupment" as "[t]he recovery by Medicare of *any outstanding Medicare debt* by reducing present or future Medicare payments and applying the amount withheld to the indebtedness." 42 C.F.R. § 405.370(a) (emphasis supplied). In contrast, for purposes of Medicare, "offset" is defined as "The recovery by

first day after the initial overpayment demand, except that "Congress prohibited [contractors] from recouping payments during the first two stages of administrative review."[71] But if a provider is still found to have been overpaid after these two appeals, recoupment may be reinitiated or resumed after action on the second level appeal.[72]

And suppliers know Medicare Part B payments may be reviewed, reopened, and recouped. A supplier enrolling in Medicare certifies that the supplier is aware of, and agrees to abide by, all applicable laws, regulations, and program instructions.[73] This is in the Medicare Enrollment Application, Form CMS-855B.[74] In submitting an application, a supplier certifies that payment of a claim is conditioned on compliance with Medicare.[75] More important, a supplier acknowledges "that any existing or future overpayment

---

Medicare *of a non-Medicare debt* by reducing present or future Medicare payments and applying the amount withheld to the indebtedness." *Id.* (emphasis supplied).

[71] *Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 527 (5th Cir. 2020) (citing 42 U.S.C. § 1395ff(f)(2)(A). *See also* 42 C.F.R. § 405.379(d)(1) (requiring that a Medicare contractor cease recoupment "upon receipt of a timely and valid request for a redetermination of an overpayment").

[72] *See* 42 C.F.R. § 405.379(d)(4)-(d)(5) (providing that "[t]he contractor may initiate or resume recoupment following action [on the second level appeal]" and recoupment remains in effect even if "the provider or supplier subsequently appeals the overpayment to the ALJ, the Medicare Appeals Council, or Federal court").

[73] *See* 42 C.F.R. § 424.510(d)(3) ("The certification statement found on the enrollment application . . . attests that the information submitted is accurate *and that the provider or supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions*" (emphasis supplied). *See also United States v. Hagen*, 60 F.4th 932, 937 (5th Cir. 2023) ("To enroll in Medicare, a supplier must agree to comply with pertinent laws and regulations").

[74] Doc. No. 40, Ex. A (Medicare Enrollment Application).

[75] *Id.* at Section 15A, Certification Statement, ¶¶ 3, 5. *See also* 42 U.S.C. § 1395gg(b)(1); 42 U.S.C. § 1395ddd(b)(3).

15

made to the supplier by the Medicare program may be recouped by Medicare through the withholding of future payments."[76] The certification therefore requires the participating supplier to acknowledge the provisional nature of Medicare Part B payments.

Under the Medicare payment system, participating Medicare Part B suppliers are promptly paid for their services, but the prompt payment is made in reliance on accurate claim submissions.[77] And the size and complexity of the Medicare program requires subsequent review and adjustments of payments to ensure the integrity of the system.[78] Thus, the Medicare payment system anticipates estimated payment subject to later adjustment such that recoupment of overpayments is central to its operations.[79]

---

[76] *See* Doc. No. 40, Ex. A (Medicare Enrollment Application).

[77] *See United States v. Moss*, 34 F.4th 1176, 1181 (11th Cir. 2022) (recognizing Medicare's reliance on accurate claim submission).

[78] *MedEnvios Healthcare, Inc. v. Becerra*, 725 F. Supp. 3d 1343, 1346 (S.D. Fla. 2024) ("The Department through CMS and its contractors relies on post-payment audits to identify problems with Medicare claims made by healthcare providers and suppliers because prepayment review of the over 1 billion claims received annually would be untenable"). *See* 42 U.S.C. § 1395ddd(b)(3).

[79] *See Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of Health & Hum. Servs.*, 468 F.3d 1347, 1349 (11th Cir. 2006) (noting that payments are typically authorized on receipt absent glaring irregularities and that payment may be suspended or recouped when overpayment is discovered); *Guidry v. Centers for Medicare & Medicaid Servs.*, No. 2:21-CV-769-SPC-NPM, 2022 WL 992248, at *2 (M.D. Fla. Apr. 1, 2022) ("Recoupment is how the federal government accounts for overpayments of Medicare funds"). *See also Alpha Home Health Sols., LLC v. Sec'y of United States Dep't of Health & Hum. Servs.*, 340 F. Supp. 3d 1291, 1303 (M.D. Fla. 2018) ("The statute defines the entitlement to payment; that is, the property interest, and here the statute clearly states that payments shall be made 'with necessary adjustments on account of previously made overpayments.' Thus, the health care provider understands that payments are made "'prior to audit,' meaning a subsequent audit may result in recoupment by the Secretary").

**4. Recoupment of Medicare Overpayments in Bankruptcy**

Here, CMS asserts the Medicare laws require that the overpayment be "withheld from future Medicare claim payments to the supplier."[80] CMS argues "[t]his adjustment process is expressly designated as 'recoupment' in the Medicare statute, *see, e.g.,* 42 U.S.C. § 1395gg, 42 U.S.C. § 1395ddd(f)(2), and in the Medicare regulations, *see* 42 C.F.R. § 405.370."[81] CMS also claims it has a common law right to recoup overpayments.[82]

CMS is correct that it generally has a right to recoup Medicare overpayments. The Medicare Act lets CMS recoup Medicare Part B overpayments against present or future Medicare payments.[83] CMS also can recoup under the doctrine of equitable recoupment, which applies when both CMS's claims and the debtor's claims arise out of the same transaction.[84] But

---

[80] Doc. No. 40, at 7.

[81] *Id.*

[82] *Id.* at 8.

[83] *See* 42 U.S.C. § 1395ddd(b)(3) (authorizing contractors in the Medicare Integrity to Program to recover "payments that should not have been made" by setoff or recoupment); 42 U.S.C. § 1395hh(a) (requiring the Secretary to prescribe regulations to carry out the administration of the Medicare system); 42 C.F.R. § 405.371(a)(3) (providing that Medicare payments to providers and suppliers may be "offset or recouped, in whole or in part, by a Medicare contractor if the Medicare contractor or CMS has determined that the provider or supplier to whom payments are to be made has been overpaid"). *See also Mount Sinai Hosp. of Greater Miami, Inc. v. Weinberger*, 517 F.2d 329, 338–39 (5th Cir. 1975) (noting that the Medicare Act recognizes the Secretary's right to recoupment); *Szekely v. Fla. Med. Ass'n*, 517 F.2d 345, 348–49 (5th Cir. 1975) ("In *Mount Sinai* we hold that the Act not only does not abrogate the common law recoupment right with regard to coverage overpayments but that it specifically recognizes such recoupment in § 1395gg"). Decisions rendered by the former Fifth Circuit before the close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[84] *See Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d 1276, 1280 (11th Cir. 2010) ("The Secretary has a common law right to recoup overpayments from Medicare Part B providers").

focusing on whether both debts "arise out of a single integrated transaction," courts are divided as to the circumstances in which CMS may recoup in bankruptcy.[85]

The Third Circuit does not allow Medicare recoupment in bankruptcy.[86] In *University Medical Center v. Sullivan*, the Court rejected the idea that "a mere logical relationship" is enough to conclude two claims arise from the same transaction for equitable recoupment.[87] It applied a strict "integrated transaction" test requiring that both debts "arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations."[88] Applying this test, the Third Circuit decided, as the Debtor advocates here, that each audit year is discernible from the next for recoupment and that the debtor's post-petition services in 1988 were not the same transaction that began in 1985.[89]

---

*See also United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390, 395 (D.C. Cir. 1997) (noting the doctrine of equitable recoupment "exempts a debt from the automatic stay when the debt is inextricably tied up in the post-petition claim"); *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 158-59 (10th Cir. 1986) (stating where unjust enrichment occurs, bankruptcy courts apply recoupment as an equitable doctrine).

[85] *See, e.g., In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 3–4 (1st Cir. 2004); *In re TLC Hosps., Inc.*, 224 F.3d 1008, 1011 (9th Cir. 2000); *Consumer Health Services of America, Inc.*, 108 F.3d at 395; *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1081 (3d Cir. 1992). *See also* 5 COLLIER ON BANKRUPTCY ¶ 553.10 (16th 2026).

[86] *In re University Medical Center*, 973 F.2d at 1081 ("we find that the ongoing relationship that exists between a Medicare provider and HHS is not sufficient to support the conclusion that Medicare overpayments . . . arise from the same transaction, for the purposes of equitable recoupment").

[87] *Id.* at 1081.

[88] *Id.* at 1081.

[89] *Id.* at 1081–82.

18

But other circuits allow Medicare recoupment in bankruptcy. In *U.S. v. Consumer Health Services of America, Inc.*, the United States sought authority to recoup Medicare Part A overpayments from a Medicare provider in bankruptcy. The bankruptcy court denied recoupment relying on *In re University Medical Center*.[90] But the D.C. Circuit reversed, applying the same "integrated transaction" test used by the Third Circuit to come to the opposite conclusion.[91] There, the Court disagreed that Medicare's audit procedure should be used to distinguish transactions.[92] Instead, the Court focused on the language of the Medicare Act itself—

> Since [the Medicare Act] requires the Secretary to take into account pre-petition overpayments in order to calculate a post-petition claim . . . Congress rather clearly indicated that it wanted a provider's stream of services to be considered one transaction for purposes of any claim the government would have against the provider.[93]

The D.C. Circuit concluded that the Medicare payment system represents a single transaction supporting the government's recoupment claim whether analyzed as statutory or equitable recoupment.[94] And the First and the Ninth Circuits have reached the same conclusion.[95]

---

[90] *Consumer Health Services of America, Inc.*, 108 F.3d at 393.

[91] *Id.* at 395 (noting that Consumer's claim for post-petition services and the pre-petition overpayments qualify as a single transaction "[e]ven under the Third Circuit's stricter standard").

[92] *Id.*

[93] *Id.*

[94] *Id.* at 394-395.

[95] *See, e.g., In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004); *In re Slater Health Ctr., Inc.*, 398 F.3d 98, 103 (1st Cir. 2005); *In re TLC Hosps., Inc.*, 224 F.3d 1008, 1013-14 (9th Cir. 2000).

In *In re TLC Hospitals*, the Ninth Circuit considered whether Medicare Part A overpayments could be recouped from a debtor's post-petition underpayments.[96] There, the bankruptcy court determined Section 553 did not permit setoffs "across the petition" and did not allow Medicare to set-off its pre-petition overpayments against post-petition underpayments.[97] But the district court reversed, concluding Medicare overpayments could be recouped both on the equitable doctrine of recoupment and on a statutory construction of the Medicare Act.[98] Following circuit precedent, the Ninth Circuit applied a "logical relationship test," where "'transaction' is a word of flexible meaning.[99] It may comprehend many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."[100] After concluding that the Medicare reimbursement adjustment process is a single transaction, the Court allowed CMS to recoup prior years' overpayments by withholding current reimbursements from the debtor.[101]

In *In re Holyoke Nursing Home, Inc.*,[102] the First Circuit followed the Ninth and D.C. Circuits. There, the debtor sought to avoid a Medicare

---

[96] *In re TLC Hosps., Inc.*, 224 F.3d at 1010.

[97] *Id.*

[98] *Id.*

[99] *Id.* at 1014 (*citing Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1402 (9th Cir. 1996).

[100] *Id.* at 1014 (quoting *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610, 46 S. Ct. 367, 371, 70 L. Ed. 750 (1926)).

[101] *Id.* at 1013–14 ("holding that HHS's overpayments and subsequent post-petition underpayments were part of the same transaction").

[102] *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1 (1st Cir. 2004).

contractor's pre-petition deductions as voidable preferential transfers, and the contractor's post-petition deductions as unauthorized offsets.[103] But the bankruptcy court allowed the government to recoup the alleged Medicare Part A overpayments, finding the government's recoupment of Medicare Part A overpayments were not preferential transfers or unauthorized offsets.[104] The *Holyoke* court affirmed the bankruptcy court's grant of summary judgment for the government, concluding that the contractual relationship between Medicare and the provider was "one, ongoing, integrated transaction."[105]

The Eleventh Circuit has not ruled on recoupment of Medicare overpayments in bankruptcy or adopted either theory. Still, this Court agrees with CMS and the First, Ninth, and D.C. Circuits that CMS's efforts to recover the alleged Medicare overpayment by adjusting payments on post-petition Medicare claims is recoupment that does not implicate the automatic stay. Whether statutory or equitable recoupment, the Medicare payment system is a single integrated transaction where suppliers and contractors are "constantly balancing payments made and readjustments for over and underpayments."[106]

---

[103] *Id.* at 3.

[104] *Id.*

[105] *Id.* at 4.

[106] *In re Fischbach*, No. 1:12-cv-00513-JMC, 2013 WL 1194850, at *5 (D.S.C. Mar. 22, 2013) (same).

The Medicare laws expressly and implicitly give CMS the right to recoup overpayments from future Medicare claims. The Medicare Act establishes the Medicare Integrity Program to, among other things, "recover [] payments that should not have been made"[107] and designates recoupment as one of the available means of recovery.[108] Likewise, the Medicare regulations expressly authorize Medicare Part B payments to providers and suppliers to be "recouped, in whole or in part, by a Medicare contractor if the Medicare contractor or CMS has determined that the provider or supplier to whom payments are to be made has been overpaid."[109] And the regulations specifically distinguish recoupment from setoff, limiting "recoupment" to recovery of Medicare debts from present or future Medicare payments.[110] These statutes and regulations clarify that the amount payable on post-petition claims owing to the Debtor must be adjusted for the alleged prior overpayments.

And the pre-petition overpayments by Medicare and post-petition services provided by the Debtor are parts of a single transaction. Whether evaluating statutory recoupment under the Medicare Act or common law or

---

[107] 42 U.S.C. § 1395ddd(b)(3).

[108] *See, e.g.,* 42 U.S.C. § 1395gg, & 42 U.S.C. § 1395ddd(f)(2). *See also Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 101, 131 S. Ct. 2238, 2245, 180 L. Ed. 2d 131 (2011) (reaffirming that where Congress uses a common-law term in a statute, the court must assume the term comes with a common law meaning, absent anything pointing another way).

[109] 42 C.F.R. § 405.371(a)(3).

[110] 42 C.F.R. § 405.370(a).

equitable recoupment, the Court must consider how best to determine and define a "single transaction," an issue on which the circuit courts are split.[111]

The Debtor here argues that the withholding by CMS cannot be recoupment because the reimbursements withheld do not correspond with the services provided and do not arise from the "same transaction or occurrence."[112] But that the Debtor provides services to different patients at different times does not destroy their logical relationship or indicate that they relate to separate transactions. Instead, the "transaction" is the reimbursement system established by Medicare laws.

Enrollment as a participating Part B supplier confers the right to bill Medicare directly and receive prompt payment. But enrollment also requires a supplier to abide by Medicare laws and accept provisional reimbursements. A Medicare Part B supplier's claim that has no glaring irregularities is typically paid immediately on its receipt.[113] Post-payment audits are then conducted to verify that payment was proper, and claims are adjusted if an overpayment is identified.[114] Once an overpayment is identified, it may be recouped from

---

[111] *Compare, e.g., United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390, 395 (D.C. Cir. 1997), *with Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1080–81 (3d Cir. 1992).

[112] Doc. No. 63 at 5-7.

[113] *Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d 1276, 1279 n.4 (11th Cir. 2010) (noting payment on claims are typically authorized immediately on receipt of claims for reasons of administrative efficiency, "so long as the claims do not contain glaring irregularities").

[114] 42 U.S.C. § 1395u; 42 C.F.R. § 421.200(d). *See also MedEnvios Healthcare, Inc. v. Becerra*, 725 F. Supp. 3d 1343, 1346 (S.D. Fla. 2024) (noting the Medicare program "relies on post-

future payment.[115] Whether applying the logical relationship test or the single integrated transaction standard used by the Third Circuit, the Court's conclusion is the same – this ongoing payment and reconciliation system is one "transaction" for recoupment.

The reality of the Medicare payment system is that patients and doctors come and go. And overpayments are rarely discovered until long after the services were rendered. Adopting the Debtor's interpretation of "transaction" – that the creditor's claim must arise of the identical transaction as the debtor's – upends the structure relied on by all Medicare providers. Instead, the Court agrees with the decision in *In re Advanced Tissue, LLC* that recoupment is "woven into the very fabric of the Medicare payment system."[116] Thus, this system of payments and later adjustments must be viewed as a single, integrated transaction for recoupment in bankruptcy.

Likewise, equitable considerations support CMS's right to recoup here. It would be inequitable to allow the Debtor, here, to accrue more than $3.7 Million in alleged Medicare overpayments, file for bankruptcy, and then

---

payment audits to identify problems with Medicare claims made by healthcare providers and suppliers because prepayment review of the over 1 billion claims received annually would be untenable").

[115] 42 C.F.R. § 405.371(a). *See also In re Advanced Tissue, LLC*, 649 B.R. 326, 330 (Bankr. E.D. Ark. 2023) (observing "the automatic stay does not bar a creditor from exercising its right of recoupment because 'recoupment is in the nature of a right to reduce the amount of a claim'").

[116] *In re Advanced Tissue, LLC*, 649 B.R. at 332-34.

continue to receive full reimbursement for new claims.[117] The Debtor received from Medicare the benefit of prompt payment on its claims, and did so knowing the claims might be reviewed, reopened, and payment readjusted if the claims were improperly paid. It would be unfair for the Debtor to enjoy the benefits of prompt payment under the Medicare system without meeting its obligations, that is, being subject to recoupment in the event of overpayment.

## IV.    Conclusion

Congress intended the Medicare payment system to operate as a continuous stream that includes adjustments for overpayments.[118] And recoupment is imbedded in the system as the method of determining the actual amounts owed.[119] The Court thus finds that CMS's overpayment claim against the Debtor arise arises from the same integrated transaction as the Debtor's present and future claims against CMS as a participating Medicare Part B supplier.

---

[117] *See In re Fischbach*, 2013 WL 1194850, at *6 (concluding "[i]t would be inequitable to allow Fischbach to accrue more than $400,000 in Medicare reimbursement overpayments, file for bankruptcy, and then continue to receive full Medicare reimbursement for the new reimbursement claims he submits").

[118] *See In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 5 (5th Cir. 2004) ("Both the Medicare statute and the provider agreement—by contemplating HCFA's payment of estimated costs, corrective audits, and retroactive adjustments or partial adjustments for overpayments and underpayments in determining HCFA's net liability for current cost-year services—strongly indicate that the contractual relationship between HCFA and Holyoke constitutes one, ongoing, integrated transaction"); *United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390, 395 (D.C. Cir. 1997) ("Congress rather clearly indicated that it wanted a provider's stream of services to be considered one transaction for purposes of any claim the government would have against the provider").

[119] *Supra* notes 94, 101 & 105.

The automatic stay does not apply to CMS's past or future exercise of its right of recoupment. The Medicare overpayments made to the Debtor may be recouped by CMS from Medicare payments owing to the Debtor by adjusting on account of previously made overpayments. And CMS may continue to recoup against the Debtor's Medicare reimbursements so much as is necessary to recover the overpayments made to the Debtor.

Accordingly, it is

**ORDERED** that

1. The Debtor's *Emergency Motion to Enforce the Automatic Stay* is **GRANTED IN PART** and **DENIED IN PART**.

2. The automatic stay imposed by 11 U.S.C. § 362(a) enjoins CMS, the Treasury, and CBE Group from collection of the Debtor's Medicare overpayments from property of the estate, including federal tax refunds and any other non-Medicare debt owed to the Debtor.

3. The automatic stay imposed by 11 U.S.C. § 362(a) does not enjoin the Department of Health and Human Service, the Centers for Medicare and Medicaid Services, First Coast Service Options, Inc., or any other Medicare administrative contractor required to reimburse the Debtor during the

26

pendency of the case from recouping the Debtor's Medicare overpayments from

the Debtor's Medicare reimbursements.


Assistant United States Attorney Christopher Emden is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF and to file a proof of service within three days of entry of this Order.